**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 28, 2011

No. 09-31084

Lyle W. Cayce
Clerk

MIRANDA MCCULLER, wife of/and; BENJAMIN MCCULLER,

Plaintiffs - Appellants - Cross-Appellees

v.

NAUTICAL VENTURES, L.L.C.,

Defendant - Appellee - Cross-Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:05-cv-01195

Before BARKSDALE, DENNIS, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Benjamin McCuller and his wife, Miranda McCuller, sued Nautical Ventures, L.L.C., under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b), after Benjamin, who was working as a longshoreman, was injured when he fell while descending a ladder on a ship owned by Nautical. The district court found that Nautical was negligent in providing a damaged ladder for his use and that Benjamin was thirty percent at fault for his injuries; the court awarded the McCullers damages accordingly.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-31084

The McCullers appeal the district court's finding of Benjamin's comparative fault and three aspects of the district court's damages award, and Nautical cross-appeals the district court's finding of liability. We AFFIRM the district court's findings of liability and comparative fault, and the district court's decision not to award damages for the loss of household services and the cost of in vitro fertilization. We VACATE and REMAND in part the district court's damages award in respect to expenses for the McCullers' future medical needs.

## I.

Benjamin McCuller worked for Halliburton Energy Services at a marine terminal in Fourchon, Louisiana. On April 2, 2004, the C-Legend, a vessel owned and operated by Nautical, docked at Halliburton's facilities to have dry bulk cement loaded into the vessel's cargo tanks. Benjamin was responsible for boarding the C-Legend to attach hoses to the vessel for this purpose. Because the vessel's two gangways were inaccessible, the crew of the C-Legend deployed an embarkation ladder, known as a Jacob's ladder, which consists of rope sides and wooden rungs. Benjamin used the Jacob's ladder five times without incident, but on his final descent down the ladder, during which Benjamin was carrying a clipboard, one of the ladder's rungs broke and Benjamin fell approximately five feet to the dock below. As a result of his fall, Benjamin sustained knee and back injuries.

The McCullers sued Nautical under the LHWCA, 33 U.S.C. § 905(b), which provides for shipowner liability for, inter alia, a breach of the vessel's "turnover duty." *Moore v. M/V ANGELA*, 353 F.3d 376, 380 (5th Cir. 2003). "The 'turnover duty' relates to the condition of the ship upon the commencement of stevedoring operations" and "requires a vessel to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he

No. 09-31084

should reasonably expect to encounter will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property." *Id.* (quoting *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994)) (internal quotation marks omitted) (citing *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 167 (1981)).  Following a bench trial, the district court determined that Nautical had breached its turnover duty by deploying a defective Jacob's ladder, which had been damaged during a deployment several weeks prior to Benjamin's fall.  The court found that the "[d]amage to the ladder"—"[a] small crack" in the wood of a rung of the ladder—"should have been apparent to a crewman [of the C-Legend] during a reasonable inspection of the ladder prior to its deployment" but "that the damaged condition of the ladder would [not] have been open and obvious to [Benjamin] McCuller" while he was using the ladder. *McCuller v. Nautical Ventures, LLC*, No. 05-1195, 2009 WL 3254290, at *3 (E.D. La. Oct. 6, 2009).  The district court found that "[a]s a result of the accident . . . , Benjamin McCuller sustained injuries to his back and legs"; was "diagnosed as having herniated discs in his lumbar, thoracic, and cervical spine, and a hernia"; "has occipital neuralgia (headaches at the back of his head) and chronic back pain"; "has undergone at least eight surgical procedures . . . including an anterior lumbar interbody fusion . . . , a second fusion with a bilateral decompression and an implantation of a bilateral stage 1 spinal cord stimulator as well as numerous invasive tests, injections and inpatient and outpatient care."  *Id.*  The court further found that Benjamin had no prior history of such injuries before his fall and that "[h]e remains in pain which is made somewhat tolerable with medication and his temporary stimulator." *Id.* at *4.

The court concluded that the McCullers were entitled to damages for Benjamin's lost wages, pain and suffering, and medical expenses; and for the loss

of consortium.    The McCullers had also sought damages for the loss of Benjamin's household services and for the cost of in vitro fertilization because Benjamin sustained nerve damage during one of his surgeries, which rendered him incapable of producing sperm.    However, the district court did not award damages for the loss of household services.    The court also did not award damages for in vitro fertilization because it "f[ound] these damages to be highly speculative." *Id.* at \*4 n.1.    The court found that Benjamin was thirty percent at fault for his injuries because he was holding a clipboard while climbing down the ladder, and it reduced the McCullers' recovery accordingly.    The court entered judgment on October 7, 2009, and denied the McCullers' motion to alter the judgment or for a new trial on October 23, 2009.    The McCullers timely appealed and Nautical timely cross-appealed.

## II.

"'The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*.'" *Mid-South Towing Co. v. Exmar Lux* (*In re Mid-South Towing Co.*), 418 F.3d 526, 531 (5th Cir. 2005); *see* Fed. R. Civ. P. 52(a).  Clear error review means that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985).  "A finding is clearly erroneous if a review of the record leaves 'a definite and firm conviction that a mistake has been committed.'" *Boudreaux v. United States*, 280 F.3d 461, 466 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 528 (5th Cir. 2001), in turn quoting *McAllister v. United States*, 348 U.S. 19, 20 (1954)).  In reviewing a district court's factual findings, we "must give due regard to the trial court's opportunity to judge the witnesses' credibility."  Fed. R. Civ.

P. 52(a)(6). Accordingly, "[t]he burden of showing that the findings of the district court are clearly erroneous is heavier if the credibility of witnesses is a factor in the trial court's decision." *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000) (internal citations and quotation marks omitted). "However, when [a factual finding is] essentially based on an incorrect legal principle, [clear error review] does not apply and we disregard any such possible findings." *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1000 (5th Cir. 1984).

**A.**

Nautical argues that a vessel has no duty to warn of dangers that would be obvious to a longshoreman of reasonable competence. This exception to the turnover duty applies if the defect causing the injury is open and obvious and one that the longshoreman should have seen. *See Moore*, 353 F.3d at 381 (citing *Scindia*, 451 U.S. at 167; *Pimental v. LTD Can. Pac. Bul*, 965 F.2d 13, 16 (5th Cir. 1992)). We review for clear error the district court's "findings that [Nautical] violated the turnover duty and that the 'open and obvious' exception did not exempt [Nautical] from the turnover duty." *Moore*, 353 F.3d at 380-82.

The district court found the damage to the ship's ladder was not open and obvious to Benjamin McCuller:

> The Court does not find it more likely than not that the damaged condition of the ladder would have been open and obvious to McCuller, who was climbing the ladder. It was not his employer's ladder. McCuller had no involvement in deploying the ladder. He had no prior experience with this type of ladder. In fact he had never climbed a Jacob's ladder to gain access to a vessel before and had never seen one being used at this dock. In the past he and his fellow employees had always used gangways. He had no duty to conduct a detailed inspection of the ladder and would not have known what to look for if he had inspected it. A small crack, which would have been noticed upon inspection, would not necessarily have been seen by McCuller, whose focus was on the upward climb and who was concentrating on grabbing the ropes of the ladder as opposed to looking down at where his feet were placed on the step.

He was relying on the Defendant employees to check it for damage prior to deploying it.

. . . . [T]his is not a case where it is "contradictory to suggest that a careful shipowner should discover an apparent defect but that a careful stevedor may miss it with impunity." *Morris v. Compagnie Maritime Des Chargeurs Reunis, S.A.*, 832 F.2d 67, 69-70 (5th Cir. 1987). Benjamin McCuller did not have the same access to or view of the defective ladder nor did he have any experience or training to alert him as to what to look for. Nautical Ventures had a duty to inspect the ladder prior to deployment. This inspection included rolling out the ladder on flat ground, looking individually at the top, bottom, and sides of each step and checking for markings, fractures, or other signs of prior crushing damage. Benjamin McCuller saw the ladder only as it was deployed off of the side of the C/V Legend. He could not see all sides of each step, and further, while climbing, it was not his job to look at each step. McCuller was looking upwards and balancing on a relatively unstable ladder hanging from a docked ship. What may be open and obvious from one angle or view is not necessarily so from another. Any damage the ladder sustained prior to deployment was not open and obvious to McCuller.

*McCuller*, 2009 WL 3254290, at *3-5.

The evidence supports the court's finding that the defect in the ladder was not open and obvious to a longshoreman once the ladder was deployed. Contrary to Nautical's contention, the district court did not mistakenly apply a subjective interpretation of the "open and obvious" doctrine. Instead, the court merely explained that the damage to the ladder should have been discovered by a crewman of the C-Legend upon a reasonable inspection while the ladder was laid out flat and the rungs could be examined from several angles, whereas once the ladder was deployed, the damage would not have been obvious to a longshoreman climbing up and down the ladder. Further, Nautical is mistaken that the district court erred in considering Benjamin's subjective awareness of the condition of the ladder: His subjective awareness was relevant because had the district court found that Benjamin was subjectively aware of the dangerous

No. 09-31084

condition, it would have had to find that the condition was open and obvious. *See Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1246 (5th Cir. 1997) ("If the longshoreman knew of the defect, then it is considered open and obvious.").

Nautical further contends that Halliburton, as McCuller's stevedore-employer, had a duty to inspect the ship's ladder thoroughly enough to discover the small crack in one of the ladder's rungs and because it failed to do so, Nautical should be relieved of liability. We are unpersuaded by Nautical's argument, which fails to demonstrate that Halliburton had such an expansive duty.

First, Nautical places too much reliance on a general statement in the Supreme Court's decision in *Scindia*, which describes the LHWCA as "requir[ing] the stevedore . . . to provide a 'reasonably safe' place to work." 451 U.S. at 170 (quoting 33 U.S.C. § 941). According to Nautical's argument, the stevedore's duty to provide a reasonably safe workplace required Halliburton to thoroughly inspect the ship's Jacob's ladder before its employees used it, and Halliburton's breach of that duty completely negates Nautical's liability for breaching its turnover duty. However, nothing in *Scindia* dictates or even implies an expansive duty for stevedores to thoroughly inspect and discover non-obvious dangers on a ship. Instead, the question in *Scindia* was whether the vessel owner's turnover duty required the vessel owner to oversee the ongoing cargo operations of longshoremen once the vessel was turned over to the stevedore in safe condition; and "[the Court] held . . . [that] a vessel need not supervise or inspect ongoing cargo operations for the benefit of longshoremen then on board." *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 102 (1994). Nautical cites no authority, and we are aware of none, that has read *Scindia* to create an expansive duty for stevedores to thoroughly inspect and discover non-obvious dangers on a ship. *See Scindia*, 451 U.S. at 180 (Powell, J., concurring)

7

No. 09-31084

("I join the Court's opinion because I agree with its basic thrust—placing the primary burden on the stevedore for avoiding injuries caused by *obvious* hazards." (emphasis added)).

Next, Nautical relies on *Polizzi v. M/V Zephyros II Monrovia*, 860 F.2d 147 (5th Cir. 1988), to argue that Halliburton failed to conduct "a reasonable inspection," which somehow relieves Nautical of any liability. However, *Polizzi* did not establish that a stevedore has a duty to conduct an inspection of a ship in such a detailed manner that it would discover a small crack in one of the rungs of the ship's Jacob's ladder. Instead, in *Polizzi*, the plaintiff longshoreman was injured when he slipped and fell on oil on the ship's deck. *Id.* at 148. We affirmed the jury's verdict for the defendants because there was expert testimony that "the hazard [of oil on the ship's deck] was obvious." *Id.* at 149. We said that "[i]t was not against the weight of the evidence for the jury to find that the stevedore [did not act with reasonable care] in failing to inspect and take the easy steps that would have avoided the hazard presented by the oily film on the deck." *Id.* That is, we concluded that there was sufficient evidence for the jury to find that the hazard was obvious, and therefore, it was reasonable for the jury to find that the stevedore had failed to discharge its duty to discover an obvious danger. In the present case, unlike in *Polizzi*, the defect was a small crack in a rung of a Jacob's ladder, which was found *not* to be open and obvious. Therefore, *Polizzi* does not establish a broad duty of the stevedore to discover non-obvious dangers on a ship.

Nautical also misplaces reliance on *Morris v. Compagnie Maritime Des Chargeurs Reunis, S.A.,* 832 F.2d 67 (5th Cir. 1987). Nautical argues that since the district court found that the defect in the ladder should have been discovered upon a reasonable inspection by the ship's crew, *Morris* required the district court to also find that the defect was open and obvious to McCuller. We

disagree.  In *Morris*, the plaintiff longshoreman was injured when the ship's straight aluminum ladder that he was using slipped on the ship's metal deck and Morris fell.  *Id.* at 68.  The district court found that the ship had breached its turnover duty.  *Id.*  We reversed because the district court had made "clearly contradictory" alternative factual findings regarding the condition of the ladder, neither of which supported the determination that the ship had breached its duty.  *Id.*  "The district court found first that the ladder had rubber feet, but they were worn slick on the bottom," and that this defect could only be discovered by inspecting the bottoms of the ladder's rubber feet.  *Id.* at 69.  There was no evidence, however, that "ordinary care would have led the shipowner to discover" this "hidden defect."  *Id.*  Therefore, the ship did not breach its turnover duty under this factual scenario.  "The district court found in the alternative that the danger posed by the ladder might have been open and obvious if the ladder simply had no rubber feet."  *Id.* (internal quotation marks and brackets omitted). We understood this "as a finding that the absence of rubber feet was in fact an obvious defect" and concluded that "[i]f obvious, it should have been as apparent to the stevedore as to the shipowner."  *Id.*  Therefore, we said, "[i]t is contradictory to suggest that a careful shipowner should discover an apparent defect but that a careful stevedore may miss it with impunity."  *Id.* at 69-70.  In other words, we simply reiterated the open and obvious defense, *viz.*, a shipowner is not liable for a stevedore's failure to discover an obvious, or "apparent," defect.  Here, by contrast, Nautical does not challenge the district court's finding that Nautical should have discovered the damage to the Jacob's ladder through the exercise of reasonable care.  And, unlike the absence of rubber feet on a ladder, which the *Morris* district court had found was an obvious defect, the small crack in the Jacob's ladder was found not to be open and obvious by the district court in this case.  Therefore, our statement in *Morris*

No. 09-31084

that a shipowner is not responsible for a stevedore's failure to discover an apparent defect is inapposite here, where the defect was not obvious. Nothing in *Morris* suggests that the stevedore is required to conduct an inspection of the ship that would reveal non-obvious dangers. Accordingly, we are unpersuaded that *Morris* required the district court to reach a different result.

Finally, Nautical argues that the testimony of Halliburton supervisor Robert Winter established that Halliburton had a duty to thoroughly inspect the ship's Jacob's ladder. Nautical asserts that Winter "testified that the ladder should have been inspected by him prior to its use, or he should have instructed McCuller and Harrington [the other Halliburton employee working with McCuller] to inspect it." Nautical's Br. 32. However, Winter's testimony is hardly so clear: Winter was asked, "If this is the first time that they [McCuller and Harrington] have used a piece of equipment in the thousands of times that vessels have called at the facility, if they had some concern, shouldn't they have inspected the ladder?" and he responded, "I guess so, yes, sir." Winter did not assert that he should have inspected the ladder or should have instructed McCuller or Harrington to inspect it. Moreover, Nautical cites no authority explaining how Winter's testimony could establish that Halliburton had a legal duty to conduct such a thorough inspection of Nautical's ship that it should have discovered the small crack in the ship's Jacob's ladder. We remain unpersuaded that Halliburton had such a broad duty.

In sum, the district court did not err in finding that the dangerous condition of the ship's Jacob's ladder was not open and obvious.

**B.**

The McCullers appeal the district court's finding that Benjamin was thirty percent at fault for his injuries because he was negligent in carrying a clipboard while descending the ladder and this contributed to his injuries. "[A]

10

longshoreman's award in a suit against a negligent shipowner [may] be reduced by that portion of the damages assignable to the longshoreman's own negligence . . . ." *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 259-60 (1979). "We review a district court's finding of . . . apportionment of fault for clear error." *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006).

We see no clear error in the district court's allocation of fault to Benjamin McCuller. During the bench trial, the district court was able to watch Benjamin demonstrate how he held the clipboard while descending the ladder and listen to Benjamin explain why this did not contribute to his injuries. Further, Benjamin's supervisor testified on cross-examination that carrying the clipboard violated Halliburton's safety protocol, and one of Benjamin's co-workers testified that it would be unsafe to carry a clipboard while climbing a ladder. Our "review of the record" does not leave us with "a definite and firm conviction that a mistake has been committed." *Boudreaux*, 280 F.3d at 466 (internal quotation marks omitted). Accordingly, we must affirm the district court's finding that Benjamin was thirty percent at fault in causing his injuries.

## C.

Finally, the McCullers challenge three aspects of the district court's damages award: They contend that (1) the district court's $100,000 award for future medical expenses was insufficient; (2) the district court's failure to award anything for the loss of Benjamin's household services was erroneous; and (3) the district court's refusal to make any award to pay for in vitro fertilization was improper. "We review a trial judge's assessment of damages for clear error." *Moore*, 353 F.3d at 384. We conclude that the district court's findings on the cost of the McCullers' future medical expenses are insufficiently particular, which precludes our review of whether that aspect of the district court's damages award was clearly erroneous. Therefore, we must remand for further findings

11

on the McCullers' future medical expenses.  As for the district court's decision not to award damages for the loss of household services and for the cost of in vitro fertilization, we conclude that the district court did not clearly err. Therefore, we affirm those aspect of the court's damages award.

### i.

Although "[Federal Rule of Civil Procedure] 52(a) does not require that the trial court set out findings on all the myriad factual questions that arise in a case . . . , parsimony in setting out subsidiary facts may run afoul of the rule . . . [that] [t]he findings and conclusions we review must be expressed with sufficient particularity . . . ." *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 432-33 (5th Cir. 1977); *see also Hatahley v. United States*, 351 U.S. 173, 182 (1956) ("[I]t is necessary in any case that the findings of damages be made with sufficient particularity so that they may be reviewed."); *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 622 (2d Cir. 2006) (Sotomayor, J.) ("Courts are not required to provide lengthy analyses in support of their damages findings but they are required under [Rule] 52(a) to adequately explain the subsidiary facts and methodology underlying the ultimate finding." (internal quotation marks omitted)).[1]  "[A] district court's failure to detail its findings or the evidentiary

---

[1] "One purpose of [Rule 52(a)] is to aid the appellate court by affording it a clear understanding of the ground or basis of the decision of the trial court.  Another purpose of the rule, identified forthrightly by Judge Frank, is to engender care on the part of the trial judge in ascertaining the facts: 'It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of the upper courts.  While it does serve that end, it has a far more important purpose[—]that of evoking care on the part of the trial judge in ascertaining the facts.  For, as every judge knows, to set down in precise words the facts as he finds them is the best way to avoid carelessness in the discharge of that duty: Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper.  The trial court is the most important agency of the judicial branch of the government precisely because on it rests the responsibility of ascertaining the facts.  When a federal trial judge sits without a jury, that responsibility is his. And it is not a light responsibility since, unless his findings are 'clearly erroneous,' no upper court may disturb them.  To ascertain the facts is not a mechanical act.  It is a difficult art, not a science.  It involves skill and judgment.  As fact-finding is a human undertaking, it can, of

basis for its findings negates our ability to apply the clearly erroneous standard of review." *Chandler v. City of Dallas*, 958 F.2d 85, 89 (5th Cir. 1992) (internal quotation marks omitted)).  A district court's findings of fact under Rule 52(a) should "afford [the appellate court] a clear understanding of the ground or basis of the decision of the trial court." *In re Ithaca Corp.*, 582 F.2d 3, 4 (5th Cir. 1978).  "Findings of fact must be made in sufficient detail and exactness to indicate the factual basis for the ultimate conclusion reached by the court." *S.S. Silberblatt, Inc. v. United States ex rel. Lambert Corp.*, 353 F.2d 545, 549 (5th Cir. 1965).  "The ultimate test as to the adequacy of findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *Id.* at 549 n.11 (internal quotation marks omitted).  "[T]he findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue."  9C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2579, at 328 (3d ed. 2008) (citing, *inter alia*, *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 433-34 (5th Cir. 1977)).

When a district court's damages award is under review, "[a] remand for further findings under Rule 52(a) is necessary . . . when an appellate court cannot adequately review the 'lump sum' award in light of the objections raised as to the validity of the award." *Neill v. Diamond M. Drilling Co.*, 426 F.2d 487, 491-92 (5th Cir. 1970); *see also OCI Wyoming, L.P. v. PacifiCorp*, 479 F.3d 1199, 1204-06 (10th Cir. 2007) ("The district court's 'findings'— . . . [that the plaintiff's] damages amounted to $377,742 —tell us *what* the district count found.  What is

---

course, never be perfect and infallible.  For that very reason every effort should be made to render it as adequate as it humanly can be.'" *Golf City*, 555 F.2d at 432-33 (citation omitted) (quoting *United States v. Forness*, 125 F.2d 928, 942-43 (2d Cir. 1942)).

missing is *why* the district court ruled as it did.  The district court does not lay out, in *any* level of detail, the facts supporting its award. . . .  We therefore vacate the judgment and remand with instructions that the district court review the evidence previously presented and . . . set[] forth sufficient findings of fact and conclusions of law pursuant to Rule 52(a) . . . ."); *Henry*, 445 F.3d at 622 ("The district court's [damages] determination," based on its finding "that CommutAir was valued at $145 million . . . was not accompanied by any explanation of the facts or methodology used to reach this figure.  In the absence of a specific explanation for the district court's findings, we are unable to determine whether this valuation, and the resulting damages award, are justified."); *In re Ithaca Corp.*, 582 F.2d at 4 (vacating and remanding a lump sum attorney's fees award that did not specify any subsidiary facts regarding the hours worked or the value of the attorney's services).

The McCullers' experts testified that approximately $1,200,000 to $2,500,000 would be required to compensate the McCullers for their future medical expenses, while Nautical's experts testified that approximately $400,000 to $565,000 would be needed to pay for those expenses.  That is, while the parties strenuously contested the maximum amount that should be awarded for the McCullers' future medical expenses, neither party argued that the level of the award should be as low as $100,000.  The district court, however, found that "McCuller's . . . future medical expenses, according to the credible evidence, will be $100,000." *McCuller*, 2009 WL 3254290, at \*4.  The district court's opinion does not adequately explain how or why the court determined that $100,000 was an appropriate award for future medical expenses when the lowest projected total cost for such expenses by either of the parties' experts was nearly four times that amount, and the parties' experts agreed substantially on Benjamin's

future medical needs—albeit with different projected costs for those needs.[2] Accordingly, we must vacate and remand for further findings and conclusions of the damages award for the McCullers' future medical expenses.

### ii.

The McCullers also requested damages for the loss of household services, which is a compensable component of damages in LHWCA suits. *See Verdin v. C&B Boat Co.*, 860 F.2d 150, 157-58 (5th Cir. 1988). The district court did not make a specific finding regarding the loss of household services. "If a trial judge fails to make a specific finding on a particular fact, the reviewing court may assume that the court impliedly made a finding consistent with its general holding so long as the implied finding is supported by the evidence." *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998). Mrs. McCuller testified that, prior to the injury, Benjamin handled yard work, performed repairs around the house, and serviced the McCullers' vehicles, and that after Benjamin's injury, she has had to take care of those chores. However, Nautical introduced surveillance video of Benjamin engaged in activities that involved standing, bending, squatting, and climbing, and argued that the McCullers should not be compensated for the loss of household services because Benjamin is still able to perform the same chores that he had performed before he was injured. Accordingly, we may assume that the district court impliedly made a finding that Benjamin is still able to perform household services, which is supported by the evidence. Therefore, we conclude that the district court did not clearly err by not awarding the McCullers damages for the loss of household services.

---

[2] The McCullers' expert's and Nautical's expert's life care plans both included expenses related to physical therapy, medications, doctors' visits, and surgery to implant a dorsal column stimulator.

### iii.

Finally, the McCullers requested damages for the cost of in vitro fertilization. The McCullers and their doctor testified that Benjamin is no longer able to deliver sperm as the result of nerve damage that he sustained during one of his back surgeries, which was done to repair damage caused by Benjamin's fall from the ladder. They further testified that prior to the surgery, which is known to involve a risk of such nerve damage, Benjamin banked sperm as a precaution because the McCullers planned to have more children; and the McCullers' doctor testified that he had recommended in vitro fertilization for the McCullers because it would provide a greater than fifty percent chance of pregnancy. The McCullers' doctor testified that the fact that the McCullers conceived their first child naturally before Benjamin's injury demonstrated their potential to conceive naturally if Benjamin had not been injured, and that Mrs. McCuller had a "good prognosis" of conceiving without medical assistance, absent Benjamin's injury.

The district court, however, denied damages for the cost of in vitro fertilization, stating, "[t]he Court has considered the credible evidence and finds these damages to be highly speculative." *McCuller*, 2009 WL 3254290, at *4 n.1. As Nautical points out, the evidence showed that the McCullers suffered from fertility problems before Benjamin's injury: the McCullers' doctor testified on cross-examination that Mrs. McCuller had had two surgeries to treat endometriosis, and could have redeveloped endometriosis since her last surgery; and that endometriosis causes decreased fertility. The McCullers' doctor further testified that there was no guarantee that Mrs. McCuller could become pregnant through in vitro fertilization. Accordingly, we conclude that the district court did not clearly err by finding that it was "highly speculative" that the McCullers required medical assistance to conceive another child because of Benjamin's

injuries; and therefore, the district court did not clearly err in refusing to award the McCullers damages for the cost of in vitro fertilization.

## III.

For the foregoing reasons, we AFFIRM the district court's findings regarding the parties' liability and comparative fault, and the district court's decision not to award damages for the loss of household services or the cost of in vitro fertilization; and we VACATE and REMAND in part for further findings and conclusions as to the McCullers' damages for future medical expenses. "The district court may, of course, make such further findings and conclusions as it may see fit, and may, in its discretion, take further evidence as to damages, or base its findings and conclusions upon the record already made." *Neill*, 426 F.2d at 492; *see also* Wright & Miller, *supra*, § 2577, at 303 (The court of appeals "may . . . leave it to the trial court to decide whether further findings should be on the basis of the existing record or on the record as supplemented on the remand.").