612 F.2d 812
 1980-1 Trade Cases 63,075
 Carl D. BARTHOLOMEW, D.C., et al., Appellees,
v.
VIRGINIA CHIROPRACTORS ASSOCIATION, INC., et al., Defendants,
and
Appeal of AMERICAN CHIROPRACTIC ASSOCIATION, Appellant.
Carl D. BARTHOLOMEW, D.C., et al., Appellees,
v.
VIRGINIA CHIROPRACTORS ASSOCIATION, etc., et al., Appellants,
v.
AMERICAN CHIROPRACTIC ASSOCIATION et al., Defendants.
Carl D. BARTHOLOMEW, D.C., etc., et al., Appellees,
v.
VIRGINIA CHIROPRACTORS ASSOCIATION, INC., etc., et al., Defendants,
and
Appeal of the METROPOLITAN LIFE INSURANCE COMPANY et al., Appellants.
 Nos. 78-1734 to 78-1736.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 5, 1979.
Decided Nov. 20, 1979.
 
 Sidney S. Rosdeitcher, New York City (Howard S. Veisz, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, John L. Walker, Jr., Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., on brief), for appellants The Aetna Casualty and Surety Co., Metropolitan Life Ins. Co., and The Travelers Ins. Co.; Stephen A. Northup, Richmond, Va. (James C. Roberts, Anthony F. Troy, Mays, Valentine, Davenport & Moore, Richmond, Va., on brief), for appellant Virginia Chiropractors Association, Inc., William L. Vohringer, D.C., Clarence Wright, D.C., Henry L. Dodge, D.C., Peter Goodfield, D.C., James S. Henderson, D.C., and George McClelland, Jr., D.C.
 Sigmund Timberg, Washington, D.C. (Hart & Hart, Attys., Ltd., Roanoke, Va., on brief), for appellant American Chiropractic Association, Inc.
 C. Jacob Ladenheim, Fincastle, Va. (Ralph C. Wiegandt, Minter, Wiegandt & Ladenheim, Fincastle, Va., on brief), for appellees Carl D. Bartholomew, D.C., et al.
 Before BRYAN, Senior Circuit Judge, HALL, Circuit Judge, and WARRINER, District Judge, sitting by designation.
 ALBERT V. BRYAN, Senior Circuit Judge:
 
 
 1
 Plaintiffs, five chiropractors engaged in private practice in Virginia and West Virginia, brought this action under the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2,[1] for damages and injunctive relief. Named as defendants were the Virginia Chiropractors Association (VCA), its president, the American Chiropractic Association (ACA), three health insurance companies and five individual chiropractors, formerly serving on the Peer Review Committee of VCA. The accusations arose out of the structure of the peer review system. Defendants' motions to dismiss were rejected;[2] they appeal; we reverse.
 
 
 2
 Peer Review's duties include pursuing inquiries from insurance companies. Upon receiving a bill for chiropractic services from an insured patient, an insurance company may submit the statement to the Committee. The latter then ascertains for the insurers the usual and customary charges for such attention, referring therefor to a schedule of rates considered fair and reasonable by the ACA and the VCA;[3] the amount so ascertained is then remitted to the insured by the insurer. Mechanisms for reviewing decisions of each State Peer Review Committee throughout the country are furnished by the ACA.
 
 
 3
 Plaintiffs, non-members of VCA, complained that the Peer Review process constituted a conspiracy between the chiropractic associations and the insurance companies to fix prices, thereby monopolizing the practice of chiropractic. The alleged price fixing stems from the ceiling imposed by the Committee on the usual and customary charge for an office visit. This ceiling is the maximum amount compensable by insurance but is apparently not adequate to compensate plaintiffs for various additional or intensive treatments they may perform during the course of an office visit. The effect, plaintiffs argue, is a boycott. Defendants have, it is asserted, refused to deal with them regarding services provided and billed in excess of the maximum for a single visit. Plaintiffs' claim is that the conspiracy also extends to coercing their patients into seeking treatment elsewhere. In order to increase the percentage of their bills reimbursable by insurance, patients will seek the services of chiropractors who have adapted their charges to the ACA and VCA fee schedule. Thus, plaintiffs assert that they are coerced and intimidated into accepting VCA's pricing rituals.
 
 
 4
 Ancillary State claims have, at the same time, been asserted against the defendants for interference with plaintiffs' contractual relations with their prospective patients, as well as for libel and slander of plaintiffs' professional practice.
 
 
 5
 In response, the ACA initially moved to dismiss the suit for lack of venue, pleading Des Moines, Iowa as its domicile, and asserting that it was not present or transacting business in Virginia.[4] All defendants have moved for dismissal under Fed.R.Civ.P. 12(b)(6) or for summary judgment under Fed.R.Civ.P. 56, on the ground that the McCarran-Ferguson Act[5] exempted them from the antitrust laws, because they were in "the business of insurance"[6] with no conduct amounting to "boycott, coercion, or intimidation."[7] They further moved to dismiss the ancillary State claims for lack of jurisdiction in the event that the Federal antitrust claim was dismissed.
 
 
 6
 The District Court denied all the motions. Upon defendants' interlocutory appeal[8] (perfected only as to the antitrust claims), we reverse.
 
 I. ACA: IMPROPER VENUE
 
 7
 Venue for this action is delineated in Section 12 of the Clayton Act in these terms:
 
 
 8
 Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.
 
 
 9
 15 U.S.C. § 22.
 
 
 10
 Admittedly, ACA was neither an "inhabitant" of Virginia, nor could it be "found" there. Yet, contrary to appellants' insistence, the District Court concluded that venue was proper in the Western District of Virginia as ACA "transacts business" in the State. Employing the familiar touchstone, the trial court examined whether ACA engaged in "(t)he practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character.' " United States v. Scophony, 333 U.S. 795, 807, 68 S.Ct. 855, 862, 92 L.Ed. 1091 (1948). See Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 373, 47 S.Ct. 400, 71 L.Ed. 684 (1927). It framed the character of the national association's operations as follows:
 
 
 11
 The ACA . . . is not a commercial, profit-making organization whose business can be described by sales and purchases, but is a non-profit organization whose activities are described as educational and informative in nature directed toward advancement of the chiropractic profession, the improvement of chiropractic performance and toward better understanding of the profession by the public, insurers, and government. Public relations and professional advancement are its "business." (Footnote omitted.)
 
 
 12
 Bartholomew v. Virginia Chiropractors Ass'n, 451 F.Supp. at 628-29.
 
 
 13
 Erroneously, however, in finding jurisdiction, the District Court accepted as decisive the following activity imputed to ACA by plaintiffs as disclosing its "transact(ion of) business" in Virginia:
 
 
 14
 The plaintiffs have alleged that in furtherance of this "business" the ACA has solicited every commercial and educational radio and television station in Virginia for air time, and received air time, billboard space and newspaper space valued at more than $250,000 for the years 1974-1976. The ACA provided the radio and television recordings and films, which in 1976 cost $180,000 to prepare. These amounts are substantial and show a continuous solicitation of advertising time in this district in furtherance of defendant's essential purpose, to supply information about the chiropractic profession. (Citations omitted.)
 
 
 15
 Id. at 629.
 
 
 16
 This recital must be tempered by the defendants' answer to plaintiffs' response to interrogatory No. 3:
 
 
 17
 (a) No cost has been incurred by ACA for the use of television, radio and newspapers in Virginia. However, the materials used by the mass media are prepared by ACA at its own cost, which, for the fiscal year April 1, 1976 to March 31, 1977, amounted to $180,000 Nationally.
 
 
 18
 (b) The public service free time that ACA has succeeded in obtaining from the TV and radio media, and the free billboard and newspaper space that it has succeeded in obtaining from those media, Has no market or commercial value for ACA. These public service educational programs prepared by ACA are devoted exclusively to educating the public as to the nature and problems of chiropractic treatment and the role of the chiropractic profession; as pointed out in 3(a), above, They operate at a loss to ACA. (Accent added.)
 
 
 19
 Notwithstanding that the burden is upon plaintiff to establish venue and jurisdiction, Call Carl, Inc. v. B P Oil Corp., 391 F.Supp. 367, 370 (D.Md. 1975), the quoted response was not traversed nor even attempted.
 
 
 20
 Enumeration of the points of contact ACA has with Virginia, even without limiting the discussion to the Western District, will entirely raze all imprint of its venue-presence. Virginia accounted for only 53 of the 8875 national members, .06 percent of its membership. ACA never qualified to do business in Virginia (only in Delaware) and its sole office was in Iowa. In Virginia, there were no offices, no officers, no agents, no property, no purchases, no seminars or workshops, and no sales save of pamphlets, journals, and other educational and public relations materials generating very little revenue. All transactions were by mail. No membership meetings were convened in Virginia; no directors or employees resided there.
 
 
 21
 ACA trained in Iowa the six chiropractors comprising peer review personnel for Virginia. Akin to its practice with all other State associations, ACA corresponded with VCA. It had not crossed into Virginia in perfecting its purposes or, as the District Judge observed, "to participate with the VCA peer review program."
 
 
 22
 ACA's solicitation of advertising time and its dissemination across Virginia boundaries of correspondence, informational materials, public service educational programs by mail, radio, television and newspaper (free of cost to ACA) was not transacting business in the State within the meaning of Section 12 of the Clayton Act, 15 U.S.C. § 22. Likewise the transmittal of such items into Virginia by mass media for subsequent telecasting, broadcasting or publishing was not within the Act's domain. People's Tobacco Co. v. American Tobacco Co., Ltd., 246 U.S. 79, 87, 38 S.Ct. 233, 62 L.Ed. 587 (1918); Golf City, Inc. v. Wilson Sporting Goods Co., Inc., 555 F.2d 426, 437-38 (5th Cir. 1977); Friends of Animals, Inc. v. American Veterinary Medical Ass'n, 310 F.Supp. 620, 624 (S.D.N.Y. 1970); Wentling v. Popular Science Publishing Co. Inc., 176 F.Supp. 652, 656-57 (M.D.Pa. 1959); Elizabeth Hospital, Inc. v. Richardson, 167 F.Supp. 155, 158-59 (W.D.Ark. 1958). Otherwise, every State in the Union into which such programs were aimed or thrust by media or mail would provide an acceptable forum for suit based on "transact(ing) business" therein.
 
 
 23
 II. DEFENDANTS' EXEMPTION FROM ANTITRUST LAWS
 
 
 24
 All of the defendants, even ACA, if it had been within the jurisdiction of the Court, were immunized from responsibility under the Sherman Act by the McCarran-Ferguson Act because they were engaged in the "business of insurance."[9] Each of them played a part in the peer review system and, thus, was in the business of insurance. Initially, before the trial court, plaintiffs conceded that the insurers Metropolitan Life Insurance Company, The Aetna Casualty and Surety Company and The Travellers Insurance Company were in the business of insurance when participating in the peer process. This concession has been withdrawn, but, nevertheless, in fact and in law, these companies were operating in that character.
 
 
 25
 The essence of the business of insurance is "the relationship between the insurance company and the policyholder." SEC v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 569, 21 L.Ed.2d 668 (1969). Mindful of this precept, the analysis now following of the parts the defendants indisputably played demonstrates beyond question their engagement in the business of insurance:
 
 
 26
 1. To begin with, the companies issued policies of health insurance.
 
 
 27
 2. As aforesaid, the pattern was for the chiropractor to send his bill to the patient and he, in turn, passed it on to his own insurance carrier for indemnification or reimbursement by virtue of the patient's insurance policy.
 
 
 28
 3. The insurance carrier thereupon submitted the bill to VCA for examination by the Peer Review Committee.
 
 
 29
 4. Payment was then made by the insurer to the patient-policyholder and not to the chiropractor, unless directed by the policyholder so to do. The patient received the amount approved by the Peer Review Committee according to the VCA fee schedule.
 
 
 30
 5. ACA's participation was to adjust, if feasible, any monetary differences between the insurer and patient in an appeal process.
 
 
 31
 6. The ACA had from the beginning contributed its share in the business of insurance by consulting with the insurers to establish the schedule of allowable fees.
 
 
 32
 7. The sole parties to the system were the insured and the insurer. Cf. id.
 
 
 33
 Exuding throughout is evidence of a unitary thesis: each defendant's activities touched upon "the business of insurance." Incidentally, plaintiffs conceded that the insurer-defendants are regulated by the State, as contemplated in the McCarran Act's grant of antitrust immunity to insurance companies.[10] Bartholomew v. Virginia Chiropractors Ass'n, 451 F.Supp. at 626 (W.D.Va. 1978). Hence, the plan was well within even the straits of the Act.
 
 
 34
 This conclusion does not trespass upon the teachings of Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). In that case there were two segregated and disparate operations: one, the offering of insurance, and the other, the procurement of drugs, admittedly an act only thinly tangential to insurance. Obtaining drugs under the Pharmacy Agreement was a business of the insurance companies, not the business of insurance. Royal Drug at 218, 99 S.Ct. 1067, n. 18. In the present instance, there is an integration of component acts resulting in a single, composite business-insurance. For an especially clarifying discourse of this and the related issues See generally Pireno v. New York Chiropractic Ass'n, No. 76-4309 (S.D.N.Y. March 15, 1979).
 
 III. NO BOYCOTT
 
 35
 "Boycott" under the Sherman Act is a "concerted refusal to deal," St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 536, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), Quoting Barry v. St. Paul Fire & Marine Insurance Co., 555 F.2d 3, 8 (1st Cir. 1977); See Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, 469 F.Supp. 552, 563 (E.D.Va.1979). Hence, we employ that standard to gauge whether peer review constitutes an "agreement to boycott, coerce, or intimidate," which could remove it from the shield of the McCarran-Ferguson Act.[11]
 
 
 36
 It is difficult to perceive any "concerted refusal to deal" in the mechanisms of the ACA or VCA. Patients may still freely choose their doctor. Furthermore, the peer review system does not limit the fees of a chiropractor. Indeed, if the Committee finds a charge to be beyond the patient's insurance, the insurer pays the patient the sum recommended by VCA; the chiropractor may then seek collection from his insured patient for the amount in excess of the policyholder's coverage.
 
 
 37
 If this arrangement induces a patient to employ a chiropractor who charges according to the Committee's allowances, this is a legitimate option of the patient; it evidences no duress by the member insurers and chiropractic associations. Likewise, the insurance companies do not jointly refuse to do business with chiropractors not belonging to the association. Similarly, no compulsion of any kind requires unwilling chiropractors to surrender to the peer review process.
 
 
 38
 The judgment denying the defendants' motions cannot stand. We remand to the District Court with instruction to grant defendants' motions to dismiss.
 
 
 39
 Reversed and Remanded with Directions.
 
 
 40
 K. K. HALL, Circuit Judge, concurring in part and dissenting in part:
 
 
 41
 I concur, somewhat timorously, in the majority's holding that the American Chiropractic Association is not transacting business in the state of Virginia. But I strongly dissent from Part II of the majority opinion, which allows providers of services to restrain trade in their markets, free from antitrust liability, if they enlist an insurer's aid in enforcing their scheme. By ignoring the language of the McCarran Act, its history, and the Supreme Court's insistence that the statute be strictly construed, the majority transforms a narrow area of deference to state regulation into a broad grant of antitrust immunity to insurance companies and their cohorts outside the industry.
 
 I.
 
 42
 The majority attempts to distinguish this case from Group Life and Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), in which the Supreme Court held that an insurer's arrangements with pharmacies, setting a maximum price for drugs furnished to its policyholders is not within the scope of the McCarran Act's antitrust exemption for the "business of insurance."[1] I agree that there is an important distinction between the two cases as the four dissenting members of the Court emphasized, Royal Drug
 
 
 43
 is not a case where the petitioner pharmacies themselves conspired to exclude others from the market, and either pressured Blue Shield to go along, or were voluntarily joined by the insurer. Such an agreement among pharmacies, itself neither necessary nor related to the insurer's effort to satisfy its obligations to its policyholders, would be outside the "business of insurance." An insurance company cannot immunize an illegal conspiracy by joining it. Id., 99 S.Ct. at 1094 (Brennan, J., dissenting) (citations omitted).
 
 
 44
 The majority's holding in this case gives insurers the power to immunize such conspiracies. Plaintiffs allege that the Virginia and American Chiropractic Associations established a peer review mechanism for the express purpose of fixing prices and monopolizing the profession, through the device of a fixed maximum charge per office visit. This fixed ceiling is significantly lower than the fee normally charged by plaintiffs, whose different treatment methodology, involving a greater number of treatments per visit, is opposed by the Associations' members. Accepting these allegations as true, as we must on a motion to dismiss, the majority now holds that, by persuading insurance companies to utilize their peer review committees and their fee schedules, the defendant chiropractors have successfully immunized their conduct from antitrust liability.
 
 
 45
 The legislative history of the McCarran Act, as it applies to the antitrust laws, shows that the sole congressional concern was with the effect of uncontrolled competition on insurance companies, whose continued solvency and ability to meet future obligations to policyholders was essential.[2] By extending McCarran Act immunity to the type of conduct alleged here, where both the perpetrators of the conduct and its impact are outside the insurance industry, the majority ignores the purpose of the Act and the Royal Drug Court's explicit direction on its construction:
 
 
 46
 It is well settled that exemptions from the antitrust laws are to be narrowly construed. This doctrine is not limited to implicit exemptions from the antitrust laws, but applies with equal force to express statutory exemptions.
 
 
 47
 Application of this principle is particularly appropriate in this case because the Pharmacy Agreements involve parties wholly outside the insurance industry. In analogous contexts, the Court has held that an exempt entity forfeits antitrust exemption by acting in concert with nonexempt parties. Id. 99 S.Ct. at 1083 (citations omitted).
 
 
 48
 I do not believe that the McCarran Act provides any shield for the conduct of defendant chiropractors. Further, the insurance companies themselves may have forfeited any exemption to which they might otherwise be entitled, by their participation in the alleged scheme.[3] The plaintiffs' allegations raise complex issues, which cannot be decided without further development of the record.
 
 II.
 
 49
 Even if the conduct of defendants is properly considered to be the "business of insurance," the McCarran Act does not automatically exempt it from the application of the federal antitrust laws. The statute affirmatively provides that these laws "Shall be applicable to the business of insurance To the extent that such business is not regulated by State law." McCarran-Ferguson Act § 2(b), 15 U.S.C. § 1012(b) (emphasis supplied).
 
 
 50
 The McCarran Act was a direct and immediate response by Congress to the Supreme Court's decision in United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which shattered the assumption that regulation of the insurance business was within the sole province of the states. Reversing a seventy-five year old precedent, the Court held that the industry was subject to federal regulation in general, and to the provisions of the Sherman Act in particular. The McCarran Act represents a compromise between the House of Representatives' desire to restore the status quo, by totally exempting the business of insurance from the federal antitrust laws, and the Senate's belief that the necessary public supervision of the industry could be best accomplished by full application of those laws.[4]
 
 
 51
 The statute establishes a scheme of complementary state and federal regulation of the insurance business, with the states given primary but not exclusive authority. The states may regulate the business of insurance within their boundaries, and may authorize practices which might reduce competition in the insurance industry. But the federal antitrust laws still apply to protect the public from practices which the states have not chosen to regulate.
 
 
 52
 The state of Virginia closely regulates many aspects of the insurance industry through its State Corporation Commission. See Va.Code § 38.1-1 Et seq.[5] But neither the Virginia Code, nor any regulation promulgated by the Commission, provides public supervision of an insurer's methods for determining reimbursement rates.[6] Therefore, I believe that this activity remains subject to the federal antitrust laws, regardless of how intimately it may be related to the "business of insurance."
 
 
 53
 In enacting the McCarran Act, "Congress was willing to permit the States to substitute regulation for competition" within the insurance industry. St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 548, 98 S.Ct. 2923, 2933, 57 L.Ed.2d 932 (1978). By failing to determine whether the state has, in fact, regulated the conduct at issue here, the majority allows what Congress was not willing to permit[7] action by "private groups . . . to enforce not public regulations written by public authority but regulations for the insurance business which they wrote themselves." 91 Cong.Rec. 1485 (1945) (remarks of Sen. O'Mahoney).
 
 
 54
 I respectfully dissent.
 
 
 
 [1]
 15 U.S.C. § 1 (1975) reads in pertinent part:
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."
 15 U.S.C. § 2 (1974) is as follows:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
 
 
 [2]
 Bartholomew v. Virginia Chiropractors Ass'n, 451 F.Supp. 624 (W.D.Va. 1978)
 
 
 [3]
 "The insurance contracts limit reimbursement to usual and customary charges for necessary health care services rendered." Id
 
 
 [4]
 15 U.S.C. § 22 (1914). Quoted at page 815 Infra
 
 
 [5]
 15 U.S.C. §§ 1011-1015 (1947)
 
 
 [6]
 Id. § 1012(b)
 
 
 [7]
 Id. § 1013(b)
 
 
 [8]
 28 U.S.C. § 1292(b) (1958)
 
 
 [9]
 15 U.S.C. § 1012(b). As here applicable, it reads:
 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.
 
 
 [10]
 Neither party raised the question of State regulations with respect to the non-insurer defendants, however
 
 
 [11]
 Id. at § 1013(b). "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."
 
 
 [1]
 In district court, the insurance company defendants insisted that "disposition of this case is simplified because the McCarran Act questions it raises have been disposed of in at least five recent cases . . . With facts not materially distinguishable from those involved here." "Insurance Company Defendants' Memorandum of Points and Authorities in Support of Their Motion to Dismiss" at 7. One of these cases was Royal Drug (defendants relied on the district court's holding in that case that the pharmacy agreements Were the business of insurance. 415 F.Supp. 343 (W.D.Tex.1976). Of the four other cases the defendants here found indistinguishable, two were singled out by the Supreme Court in Royal Drug as being "in conflict" with the Court's own interpretation of the phrase "business of insurance": Anderson v. Medical Service, 551 F.2d 304 (4th Cir. 1977) and Proctor v. State Farm Mutual Automobile Insurance Co., 561 F.2d 262 (D.C.Cir. 1977) (Vacated and remanded, 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979)). Royal Drug, 99 S.Ct. 1072, n.2
 
 
 [2]
 Congress' primary concern in enacting the McCarran Act was to "ensure that the States would continue to have the ability to tax and regulate the business of insurance," Royal Drug, 99 S.Ct. at 1076, following the Supreme Court's ruling that insurance is interstate commerce. The applicability of the antitrust laws to the insurance business was only a "secondary concern," which "focused simply on whether cooperative rate-making should be exempt." Id. at 1076, 1079. See S.Rep. No. 20, 79th Cong., 1st Sess. (1945); H.R.Rep. No. 143, 79th Cong., 1st Sess. (1945); 91 Cong.Rec. 1442-1444, 1477-1489 (1945)
 
 
 [3]
 Plaintiffs claim that the insurance companies' participation goes beyond their use of peer review recommendations to determine the amount of reimbursement they will pay. According to plaintiffs, the insurers have advised their policyholders that plaintiffs' fees are unreasonable, and have defended policyholders against suit brought by plaintiffs to recover the difference between plaintiffs' actual charge and the ceiling fixed by the peer review committee
 
 
 [4]
 For a detailed history of the McCarran Act, See C. Weller, The McCarran-Ferguson Act's Antitrust Exemption for Insurance: Language, History and Policy, 1978 Duke L.J. 587
 
 
 [5]
 Two of the ten articles in the Virginia Code's insurance provisions were enacted in direct response to the McCarran Act. Article 6 apparently seeks to fully displace the Federal Trade Commission Act within the state, by listing and defining all insurance company practices "which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." Va.Code §§ 38.1-49 to -57. See FTC v. National Casualty Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958). The State Corporation Commission is given enforcement power, but may not "enlarge upon or extend" the detailed listing in the statute. Va.Code § 38.1-53. Article 7, the "antitrust provisions," does not purport to be similarly exclusive. It simply forbids two types of activities, insurance company mergers and interlocking directorates, if they would "substantially lessen competition generally in the business of insurance, or (tend) to create a monopoly therein." Id., §§ 38.1-58, -59. There is no indication that, by failing to deal with other practices having an anticompetitive impact, the Virginia legislature intended to authorize such practices or to remove them from federal antitrust scrutiny
 In addition to the Code provisions relating specifically to the insurance business, Virginia has a state antitrust law, Va.Code § 59.1-9.1 Et seq., which arguably applies to the conduct alleged in plaintiffs' complaint. See Blue Cross v. Commonwealth, 211 Va. 180, 176 S.E.2d 439 (1970). But the McCarran Act does not grant primacy to all types of state regulation which might apply to the business of insurance. The Act concerns only "the type of state regulation that centers around the contract of insurance." SEC v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969).
 
 
 [6]
 In 1977, the insurance code's listing of unfair or deceptive trade practices was amended to prohibit fourteen specific "unfair claim settlement practices." Va.Code § 38.1-52(8a). Regardless of whether this statute now provides state regulation of the particular conduct at issue in this case, and it is not clear from the face of the statute that it does, it would not bar plaintiffs' complaint, which was filed in 1977 and concerns conduct which began in 1973
 The conduct of defendant chiropractors is clearly not regulated by the state's insurance laws. Those laws apply only to insurance companies and their agents, and the State Corporation Commission, which has enforcement responsibility, has no authority over providers of services. See Blue Cross v. Commonwealth, supra at 192, 176 S.E.2d at 447. Yet the majority offers McCarran immunity to all defendants, including the ACA, which is not even subject to service of process within the state.
 
 
 [7]
 In signing the McCarran Act, President Roosevelt stated that "Congress did not intend to permit private rate fixing which the Antitrust Act forbids, but was willing to permit actual regulation of rates by affirmative action by the states." S. Rosenman, The Public Papers of Franklin D. Roosevelt 587 (1950) (quoted in Royal Drug, supra, 99 S.Ct. at 1079). As the Court noted in Royal Drug, 99 S.Ct. at 1076-1080, the floor debates also show that the Act's purpose was to defer to the states' desire to permit certain anticompetitive conduct, particularly cooperative ratemaking. See 91 Cong.Rec. 1442-1444, 1477-1489 (1945)