SHERMAN COLLEGE OF STRAIGHT CHIROPRACTIC, et al.

v.

AMERICAN CHIROPRACTIC ASSOCIATION, INC., et al.

Civ. A. No. C81–1767.

United States District Court, N. D. Georgia, Atlanta Division.

March 3, 1982.

Supplemental Order March 18, 1982.

---

Herbert P. Schlanger, Sherry Armstrong, Atlanta, Ga., for plaintiffs.

Hugh W. Gibert, Atlanta, Ga., Lewis M. Popper, C. Coleman Bird, John F. Daly, Washington, D. C., Paul E. Goodspeed, Denver, Colo., Frank B. Strickland, Donald F. Walton, Atlanta, Ga., for defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This action arises out of a long-standing doctrinal dispute in the field of chiropractic.

According to the Complaint, Plaintiffs are believers in "straight" chiropractic, and thus are of the opinion that the function of chiropractic is to adjust subluxations; Defendants are of the "mixer" school, and thus believe that the objectives of chiropractic are the diagnosis and treatment of disease. Complaint at ¶ 12(a). Plaintiffs allege that Defendants have conspired to restrain trade by preventing straight chiropractors from practicing their trade. Two Defendants have now moved that the action against them be dismissed for improper venue.

A brief introduction to the four Plaintiffs and four Defendants is helpful in understanding the issue facing the Court. Plaintiffs are a chiropractic educational institution located in Spartanburg, South Carolina, two of its students, and the Straight Chiropractic Academic Standards Association, Inc., a non-profit organization that seeks to evaluate and accredit schools of straight chiropractic.[1] The principal place of business of SCASA is in Atlanta, Georgia, within the Northern District of Georgia. Plaintiffs have common counsel in this action. The individual Defendant is the president of a mixer chiropractic educational institution located in Marietta, Georgia, which is within the Northern District of Georgia. There are three corporate Defendants, none of whom are incorporated in Georgia. Defendant American Chiropractic Association ("ACA") is a non-profit trade organization dedicated to the advancement of chiropractic; its principal place of business is in Arlington, Virginia. Defendant National Board of Chiropractic Examiners ("NBCE"), a non-profit organization that designs, administers and scores the national chiropractic examination, has its principal place of business in Greeley, Colorado. Defendant Council on Chiropractic Education,

which is the entity recognized by the U.S. Department of Education as the official accreditor of chiropractic educational institutions, has its principal place of business in Des Moines, Iowa. All Defendants have retained separate counsel. It is ACA, the trade organization, and NBCE, the testing organization, that have moved for dismissal.

The venue provision of the Clayton Act applicable to corporations provides that venue is proper "not only in the judicial district whereof [the corporate defendant] is an inhabitant, but also in any district wherein it may be found or transacts business." Clayton Act, § 12, 15 U.S.C. § 22. Plaintiffs concede that ACA and NBCE are neither inhabitants of nor found in the Northern District of Georgia, but contend that both organizations "transact business" here.[2]

■■ In enacting the Clayton Act, Congress intended "to provide broader and more effective relief, both substantively and procedurally, for persons injured by violations of its antitrust policy." *United States v. National City Lines, Inc.*, 334 U.S. 573, 581, 68 S.Ct. 1169, 1174, 92 L.Ed. 1584 (1948). Section 12 resulted from the desire of Congress to reshape civil procedure to favor antitrust plaintiffs; it "materially enlarged" the usual venue provisions. *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 372, 47 S.Ct. 400, 403, 71 L.Ed. 684 (1927). Section 12's "transacts business" is not the equivalent of the "doing business" language of the general venue statute, 28 U.S.C. § 1391(c), but has "a much broader meaning." *United States v. Scophony Corp.*, 333 U.S. 795, 807, 68 S.Ct. 855, 861, 92 L.Ed. 1091 (1948). A corporation "transacts business" in a district "if in fact, in the ordinary and usual sense, it

---

**1.** All characterizations of the parties as "mixers" or "straights" contained in this paragraph are taken from the Complaint. Some or all of these characterizations are disputed by various Defendants.

**2.** It is well established that section 12 of the Clayton Act supplements rather than replaces the general federal venue statutes. *See, e.g., In re Chicken Antitrust Litigation*, 407 F.Supp.

1285, 1290 (N.D.Ga.1975); 14 J. von Kalinowski, Antitrust Laws and Trade Regulation § 104.04 (1981) and cases cited therein at 104–30 n.5. Plaintiffs also argue that venue is proper under 28 U.S.C. § 1391(b), a general venue statute, because the action "arose" within this district. The Court need not reach this argument.

'transacts business' therein of any substantial character." *Eastman Kodak*, 273 U.S. at 373, 47 S.Ct. at 403. The Supreme Court elaborated upon this somewhat circular language in *Scophony*, where it stated that *Eastman Kodak* made "the practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character' . . . the test of venue." 333 U.S. at 807, 68 S.Ct. at 861. Thus, the issue before the Court is whether ACA and NBCE carry on business of any substantial character, in the practical, everyday business or commercial sense, in the Northern District of Georgia.

■ In the case of NBCE, this is not a difficult question. NBCE designs and scores the national chiropractic examination which is administered twice each year. The test is offered internationally at 16 sites; one of those sites in located within this district, in Marietta, Georgia. Affidavit of S. R. Waters, dated November 23, 1981 ("Waters Affidavit") at ¶ 11. In addition, NBCE sends test results to the Georgia State Licensing Board at the request of the student test takers. Waters Affidavit at ¶ 10. NBCE points out that it hires local residents to administer the tests in Marietta on its behalf, and that it sends test results to all 50 state licensing boards. Its business in the district, NBCE argues, is neither "substantial" nor "continuous," [3] and thus is an insufficient premise for venue under section 12.

NBCE's arguments ignore the nature of its business. NBCE's major, if not exclusive, function is to develop, administer and score a semi-annual examination, and to provide the results of that examination to interested parties, including state licensing boards. Arguably the furnishing of scores

to a state board located in this district would by itself qualify as section 12 transaction of business. It is clear, however, that the semi-annual administration of the test by NBCE within this district is the carrying on of substantial business "in the practical, everyday business or commercial concept of doing business." *Cf.* dicta in *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 437 (5th Cir. 1977) ("certainly the conducting of a golf tournament by [the Professional Golfers Association] in a particular judicial district would constitute the transaction of business in that district within the meaning of the Clayton Act," apparently even if only done once).

Administering the semi-annual test *is* what NBCE does; Marietta is one of 16 international sites at which NBCE transacts this business. *Cf. Levin v. Joint Commission on Accreditation of Hospitals*, 354 F.2d 515, 518 (D.C.Cir.1965) (per curiam) (holding that venue was proper under section 12 against national Commission on Accreditation which performed inspections of hospitals, "without which the Commission's work cannot go forward," within district). Considering the issue pragmatically, in light of the nature of NBCE's business, the Court finds its business contacts with this forum to be substantial. Thus, NBCE "transacts business" within this district, and venue is proper under section 12 of the Clayton Act.

The question of whether ACA transacts business here is a closer one. ACA is a trade organization, comparable in function to the American Bar Association.[4] According to its Executive Vice President,

ACA's activities are educational and informative in nature. They are directed

---

3. NBCE cites an earlier opinion of this Court for the proposition that activity must be "continuous" to constitute "transacting business." *Chicken Litigation*, 407 F.Supp. at 1291. However, the more accurate reading of this *Chicken Litigation* dicta is considerably narrower; Judge O'Kelley merely indicated that one single transaction will *not* constitute the transaction of business, in *most* cases. At any rate, NBCE's contacts with this district are regular rather than sporadic, and thus "continuous."

4. There is one important distinction between ACA and parallel organizations such as the American Bar Association, of course; because of the doctrinal split within chiropractic, the Court assumes that ACA does not enjoy the same degree of professional and public acceptance as an organization that represents the interests of all practitioners. ACA's functions, however, appear quite similar to organizations such as the American Bar Association.

to the advancement of the chiropractic profession; the improvement of the levels of chiropractic performance; and the better understanding of the problems of the chiropractic profession on the part of government, the general public, insurance companies, health care contractors and other groups and persons using, providing or involved with chiropractic services. Affidavit of Gerald M. Brassard dated November 25, 1981 ("Brassard Affidavit") at ¶ 3.

Plaintiffs base their section 12 venue argument on several forms of ACA "business" in this district. First, they suggest that the ACA has regularly sponsored seminars and symposia in the district during the last five years. Second, Plaintiffs cite ACA's distribution in this district of "public service educational programs designed to promote general safety and health awareness on the part of consumers," Brassard Affidavit at ¶ 8. These programs are carried as free public service announcements by radio and television stations, newspapers and billboards; their retail value in Georgia over the past five years exceeds $400,000.[5] Third, Plaintiffs cite the sale of insurance in this district by a company related to the ACA, the National Chiropractic Mutual Insurance Co.; such sales apparently occur through the nationally distributed ACA Journal of Chiropractic. Fourth, Plaintiffs cite one instance in which the ACA has sent materials promoting itself to chiropractic educational institutions, one of which is located in this district. Finally, ACA admits that it sells educational materials in this district; it estimates its state-wide total annual sales to be $2,300. Supplemental Affidavit of Gerald M. Brassard dated January 7, 1982 ("Brassard Supp. Affidavit") at

¶ 7. The question facing the Court is whether these activities constitute "transacting business" within this district, either individually or collectively. The Court will first consider these activities individually.

■ None of the three last-listed activities, the Court concludes, individually constitutes "transaction of business." It is settled law that a national membership organization does not "transact business" in a district simply because it has members in the district and mails journals and other materials to those members. *E.g., Golf City, Inc. v. Wilson Sporting Goods Co.,* 555 F.2d 426, 438 (5th Cir. 1977); *Health Care Equalization Committee v. Iowa Medical Society,* 501 F.Supp. 970, 981–82 (S.D.Iowa 1980); *Friends of Animals, Inc. v. American Veterinary Medical Association,* 310 F.Supp. 620, 624 (S.D.N.Y.1970). Furthermore, one oft-cited opinion holds that an organization's commercial offers to its members in the pages of such journals do not constitute "transaction of business." *Wentling v. Popular Science Publishing Co.,* 176 F.Supp. 652, 657 (M.D.Pa.1959). The reasoning of these cases applies to the offer for sale of insurance in the ACA Journal of Chiropractic by the National Chiropractic Mutual Insurance Co.[6] The Court rejects Plaintiffs' arguments that the annual sale of considerably less than $2,000 worth of educational materials[7] and the one mailing of promotional materials[8] constitute "transaction of business" for a different reason; in the context of the business of a national organization such as ACA, the dollar amounts and number of occurrences are negligible.

Plaintiffs' two remaining allegations of the local "transaction of business" by ACA

5. Although there is no direct evidence of this fact before it, the Court will assume that a sizeable percentage of these public service materials were distributed in the Northern District of Georgia.

6. Thus the Court need not decide whether the National Chiropractic Mutual Insurance Co. has ties with ACA sufficient to justify the attribution of its business to ACA.

7. The ACA annual figure of $2,300 includes all sales to Georgians; the total sales to residents of the Northern District of Georgia must therefore be considerably less.

8. Plaintiffs' submissions do not conclusively establish that this mailing reached Life Chiropractic College in Marietta; Plaintiffs' evidence consists only of a cover letter from ACA addressed to "Chiropractic College Presidents." *See* Exhibit 41 to Plaintiffs' Response to Motion of ACA to Dismiss.

appear to have more merit. These allegations concern the ACA's sponsorship of seminars in this district, and its placement of public service announcements on local radio and television stations, billboards and newspapers.

ACA's Executive Vice President describes the organization's purposes as "educational and informative in nature." Brassard Affidavit at ¶ 3. In light of these purposes, Plaintiffs contend that ACA is carrying out these purposes when it conducts seminars for chiropractors, and when it places public service announcements whose purpose, ACA freely admits, is educational. *See* Brassard Affidavit at ¶ 8.

■ One Circuit Court of Appeals has rejected Plaintiffs' argument as to ACA's public service announcements. *Bartholomew v. Virginia Chiropractors Association*, 612 F.2d 812 (4th Cir. 1979). The *Bartholomew* court gave two reasons for its finding that ACA's distribution of public service announcements was not the transaction of business. First, the court was influenced by ACA's claim that "the public service free time that ACA has succeeded in obtaining . . . *has no market or commercial value for ACA*." *Id.* at 815 (emphasis in original). The *Bartholomew* court seems to have decided that ACA was not "transacting *business*" because it derived no *commercial* benefit from its placement of public service announcements. This reasoning is vulnerable on two counts: it is based on an arguably inaccurate premise, because ACA and its members may well reap indirect commercial benefits from its public service announcements,[9] and it ignores the noncommercial nature of ACA's business; there is ample precedent for finding that noncommercial organizations can "transact business." *See, e.g., Levin v. Joint Committee on Accreditation of Hospitals*, 354 F.2d 515, 517–18 (D.C.Cir.1965) (per curiam) (Joint

Committee on Accreditation of Hospitals "transacts business" within district); *Health Care Equalization Committee v. Iowa Medical Association*, 501 F.Supp. 970 (S.D.Iowa 1980) (American Medical Association "transacts business" in district); *Bogus v. American Speech and Hearing Association*, 389 F.Supp. 327 (E.D.Pa.1975) (American Speech and Hearing Association "transacts business" in district). The *Bartholomew* court's second rationale was that ACA's distribution of public service announcements is the functional equivalent of a commercial national advertising campaign, and as such does not by itself constitute "transaction of business." 612 F.2d at 816. It is the law of this Circuit[10] that "national advertising which finds its way into a particular jurisdiction is insufficient to support a finding of transaction of business." *San Antonio Telephone Co. v. American Telephone & Telegraph Co.*, 499 F.2d 349, 351 n.5 (5th Cir. 1974), quoting *Albert Levine Associates v. Bertoni & Cotti*, 309 F.Supp. 456, 460 (S.D.N.Y.1970). The Fifth Circuit has further suggested that free advertising provided to a professional trade organization (the Professional Golfers Association) in locally distributed magazines does not constitute "transaction of business." *Golf City*, 555 F.2d at 438. The Court notes that ACA's public service announcement "advertising" activities in this district are considerably more extensive than were the PGA's in *Golf City*. Nonetheless, ACA's activities are national in scope. Brassard Affidavit at ¶ 8. Thus the *San Antonio Telephone* reasoning would appear to apply to them, and so the Court, along with one member of the *Bartholomew* panel, "concur[s], somewhat timorously" with the *Bartholomew* holding that ACA's public service announcements do not by themselves constitute "transaction of business" in this district. *Bartholomew*, 612

---

9. ACA's public service announcement "promote general safety and health awareness on the part of consumers." Brassard Affidavit at ¶ 8. Presumably some of the consumers exposed to ACA public service announcements will respond by visiting their local chiropractor,

who ultimately provides the ACA's financial support.

10. Cases decided by the Fifth Circuit Court of Appeals before October 1, 1980 are the law of this Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir., 1981) (en banc).

F.2d at 818 (Hall, J., concurring in part and dissenting in part).

■ Plaintiffs' remaining allegation concerns ACA's involvement with various seminars and symposia in this district. Plaintiffs state that their still incomplete factual research has revealed ten ACA-sponsored events in this district during the past five years. Closer examination reduces Plaintiffs' list to three or four such events, however; four of the listed seminars took place in Macon, Georgia, which is not in the Northern District of Georgia, see Exhibits 4, 5, 8 and 10 to Plaintiffs' Response to Motion of ACA to Dismiss,[11] and it appears that one of the Atlanta events is listed twice, see Ex. 6 and 7. There is evidence that one of the remaining five events was cancelled and thus never took place in this district. Finally, ACA disputes Plaintiffs' contention that it sponsored one of the remaining four events.[12] See Brassard Supp. Affidavit at ¶ 6.

ACA's purposes are "educational and informative." The Court is faced with the question of whether the sponsorship of three or four seminars in this district over a five-year period by an organization with such purposes constitutes the "transaction of business" under the Scophony/Eastman Kodak definition. Case law on this issue is of little help. Courts often consider the fact that an organization has held no local meetings or symposia in finding that an organization has not "transacted business" within the district. See, e.g., Bartholomew, 612 F.2d at 816 ("In Virginia, there were no ... seminars or workshops" sponsored by ACA); Health Care Equalization Committee, 501 F.Supp. at 980 (American College

of Radiology "has held no seminars, workshops, or other meetings in Iowa"); Academy of Ambulatory Foot Surgery v. American Podiatry Association, 516 F.Supp. 378, 380 (S.D.N.Y.1981) ("the last APA annual meeting in New York took place in 1964"). When an organization has conducted some meetings or seminars in a district, however, the case law becomes less clear. Contrast, for example, the attitudes expressed in Friends of Animals and Bogus. During one year, the American Veterinary Medical Association had "sponsor[ed], co-sponsor[ed], or attend[ed] as a guest ... about 140 professional and scientific meetings ... only 2 of which were held in this district"; the Friends of Animals court held this to be "occasional and sporadic" contact, insufficient to constitute the "transaction of business." 310 F.Supp. at 623–24. On the other hand, the Bogus court found that the American Speech and Hearing Association had transacted business in the district; as one supporting factor, the court noted that three of the 189 conferences sponsored by the organization over a four-year period had been held in the district. 389 F.Supp. at 329 n.3, 330.

"The only rule of law which is uniformly applicable to all cases involving venue [is that] the decision depends entirely upon the particular facts involved." Golf City, 555 F.2d at 438, quoting Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Breeders' & Exhibitors' Association, 344 F.2d 860, 863 (9th Cir. 1965). The sponsorship of three or four seminars over a five-year period strikes the Court as more than "occasional and sporadic" contact with this district.

---

**11.** Further references to Exhibits to Plaintiffs' Response to Motion of ACA to Dismiss will be designated "Ex."

**12.** ACA contends that this symposium was conducted by an independent organization, the Council on Neurology. ACA concedes that it has approved the formation and ratified the rules of the Council on Neurology, but contends that this organization operates independently of the ACA. Brassard Supp. Affidavit at ¶ 5. The Court notes that promotional materials for this symposium carried the heading, "Council on Neurology, American Chiropractic

Association, First Annual Symposium." See Ex. 9. Regardless of the degree of ACA control over the Council on Neurology, the Court infers that ACA permitted the use of its name in the promotion of this symposium. The Court need not decide whether this symposium was sponsored by ACA, however. The ACA concedes that it sponsored the remaining three events in this district, see ACA Reply Brief filed January 12, 1982 at 8, and the Court's decision on the venue question would be unaffected by the addition or subtraction of this one event from the ACA total.

This is especially true in light of the fact that "the workshops . . . are the means by which defendant attempts to fulfill its goal of maintaining high standards for professionals." *Bogus*, 389 F.Supp. at 330. ACA is in the business of educating and informing its members and others; it does so, in part, through seminars and symposia.[13] It has held such seminars and symposia in this district on a fairly regular and continuous basis over the past five years.

Furthermore, even though the Court has rejected Plaintiffs' suggestions that four other types of ACA activity in this district would be sufficient in themselves to constitute the transaction of business, the Court must still consider whether all ACA activities considered together constitute the transaction of business. *Golf City*, 555 F.2d at 438. If the sponsoring of three or four seminars does not constitute the transaction of ACA's business in this district, those seminars plus the public service announcements, plus the sale of a small amount of educational literature, plus the mailing of promotional material to a local chiropractic school, taken together, indicates that ACA has pursued its "educational and informative" business in this district "in the practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character.'" *Scophony*, 333 U.S. at 807, 68 S.Ct. at 861.

If the Court were to decide that venue was improper as to ACA, Plaintiffs would be faced with the necessity of bringing another lawsuit against ACA in some other jurisdiction in order to obtain complete relief. This is precisely the situation that Congress intended to eliminate when it broadened the Clayton Act's venue provisions to include jurisdictions in which a defendant "transacts business." *See National City Lines*, 334 U.S. at 581, 68 S.Ct. at 1174 ("Insofar as convenience in bringing suit and conducting trial was involved, the purpose was to make these less inconvenient for plaintiffs or . . . to remove the

'often insuperable obstacle' thrown in their way by the existing venue restrictions"). The remedial purpose of section 12 of the Clayton Act has led one court to state that its provisions, unlike other venue statutes, are intended for the benefit of plaintiffs. *Cascade Steel Rolling Mills, Inc. v. C. Itoh and Co. (America)*, 499 F.Supp. 829, 833 (D.Or.1980).

The Court concludes that ACA "transacts business" within the Northern District of Georgia. Consequently, venue is proper in this district, as is service of process, under section 12 of the Clayton Act.

On the basis of the foregoing analysis, the Court DENIES the Motion of Defendant National Board of Chiropractic Examiners to Dismiss for Improper Venue, and also DENIES the Motion of Defendant American Chiropractic Association to Dismiss and to Quash Service of Process.

Two other motions are presently pending before the Court. Plaintiffs have moved to dismiss the counterclaim of Defendant Council on Chiropractic Education, Inc. This Defendant and Plaintiffs have since stipulated that the counterclaim be dismissed, and the Court therefore DISMISSES the Motion to Dismiss as MOOT.

Plaintiffs have requested that the Court designate this case as a proper one for handling pursuant to the Manual for Complex Litigation. This case does not appear to be especially complex; it involves only four Plaintiffs, who have joint counsel, and four Defendants, no class allegations, and a one count Complaint whose factual allegations are straightforward and contained in one subparagraph. *See* Complaint at ¶ 13(c). The Court DENIES Plaintiffs' request for a preliminary pretrial conference, and for treatment of this matter as complex litigation.

### SUPPLEMENTAL ORDER

On March 3, 1982, the Court denied a motion by Defendant National Board of Chiropractic Examiners ("NBCE") to dis-

**13.** ACA contends that Atlanta was chosen for these seminars because of its location and transportation facilities, and that the seminars were not oriented toward problems or developments peculiar to Georgia. The Court fails to see the relevance of this argument.

miss for improper venue. NBCE's motion to dismiss contained an alternative request that the Court sever the action and transfer the portion concerning NBCE to the District of Colorado, pursuant to 28 U.S.C. § 1404(a). This statute grants the Court the discretion to transfer an action "for the convenience of parties and witnesses, in the interest of justice." The Court has decided that justice would best be served by permitting Plaintiffs to maintain a single action against all Defendants in this district. Order entered March 3, 1982 at 444–445. The Court therefore DENIES Defendant NBCE's alternative request that the action be severed, and the action against it be transferred to the District of Colorado.