Cite as 2025 Ark. App. 593

# ARKANSAS COURT OF APPEALS
## DIVISION II
#### No. CV-25-95

| | | |
|---|---|---|
| CLINTON BUNKER | | Opinion Delivered December 10, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT [NO. 43PR-24-376] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE SANDY HUCKABEE, JUDGE |
| | | AFFIRMED |

**BART F. VIRDEN, Judge**

Clinton Bunker appeals the Lonoke Circuit Court's denial of his motion to dismiss the State's petition for involuntary commitment. We affirm.

I. *Relevant Facts*

Heather Clark and Clinton Bunker were divorced in 2019 after eleven years of marriage. They have two children, MC1 and MC2 (ages fifteen and sixteen at the time of the hearing) and share joint custody in a week on, week off arrangement.

On October 29, 2024, Clark filed a petition for Bunker's involuntary commitment. On the cover sheet attached to the petition, Clark checked the boxes indicating that she was requesting Bunker's "civil commitment" and "narcotic commitment." The petition provided that it was filed pursuant to both Ark. Code Ann. § 20-64-801 (Repl. 2018) and Ark. Code Ann. § 20-47-207 (Repl. 2018). Clark believed that Bunker was "homicidal, suicidal, or

gravely disabled," and he had "a mental illness and should be involuntarily admitted to an appropriate receiving facility for treatment of mental illness pursuant to Ark. Code Ann. § 20-47-207 upon completion of substance abuse treatment." In the affidavit attached to the petition, Clark alleged that three days earlier, Bunker asked MC1 and MC2 to listen to a Nest camera recording of activity in the house to confirm his belief that a voice could be heard repeating "Kill [MC1]" and "Kill the girls." The girls denied hearing the voice despite their father's insistence that they could hear it. Bunker, who had loaded guns in his home, insisted on reteaching his daughters how to use a shotgun for their safety. He explained that they needed to know how to use the shotgun because bad people wanted to kill them. When MC1 told him that she was not sure if he was going to hurt her, Bunker just "stared at her for a moment" and resumed gun training. He insisted that he was not insane and increased his home security. He told MC1 and MC2 that artificial intelligence had told him to build a device that required lithium, and the girls reported that Bunker spent a lot of time in the attic talking to AI. MC1 and MC2 reported that their father had been drinking alcohol, and they did not feel safe being around him.

The same day the petition was filed, the circuit court entered the order for immediate detention, finding that Clark's petition supported a finding of reasonable cause to believe that Bunker met the statutory criteria for involuntary admission, and immediate detention was necessary to protect him from imminent danger of death or serious bodily injury. The court found that Bunker's involuntary commitment met the criteria set forth in Ark. Code Ann. § 20-64-801, "alcohol/drug addiction and mental illness," and he was involuntarily

2

admitted to Harbor House. After he was discharged from Harbor House, he was admitted to Baptist Health Medical Center-Little Rock for a psychiatric evaluation. He was discharged from Baptist the same day.

A hearing was held on October 31. Before the hearing, Bunker filed a motion to dismiss contesting the veracity of Clark's statement, arguing that she had no personal knowledge of his mental or physical state or any personal knowledge of the events she reported in her affidavit. Bunker argued that because Clark had relied on hearsay, she had not met the fact-pleading requirement, and her petition should be dismissed. Bunker contended he was not addicted to drugs or alcohol, and there were no allegations that he was homicidal, suicidal, or gravely disabled by drugs and alcohol. He had passed his drug screening conducted at Harbor House, and his evaluation showed that he did not meet the criteria for substance-abuse treatment. He asserted that there was no probable cause for his immediate detention.

At the hearing, Clark testified that as a result of what her daughters told her, she became worried about their safety and filed the petition for commitment and a protection order. Clark asked the court for Bunker to be evaluated for drug and alcohol abuse. Clark clarified that she personally had not seen or heard any of the events her daughters told her about, but she had concerns based on pictures of loaded guns that the girls had shown her and things the girls had told her.

MC1 testified that she and her sister were with their father when he began acting in ways that made her uncomfortable and worried her. Sunday evening, she and her sister were

3

getting ready in the bathroom when Bunker told them he had a recording of people whispering, and he played the recording. MC1 did not hear anything, but Bunker told them that it said, "I will kill you, [MC1]. I will kill you, MC1, and I will kill you both." MC1 testified that she only heard dishes being cleaned and the washing machine running. MC1 asked him "Are you sure it's not just you whispering it?" Bunker denied it was him speaking. MC1 testified that this was unusual behavior from her father, she was confused, and she recalled that her father's mother was schizophrenic. Bunker told MC1 that he did not think he was "going crazy" and explained that he thought the voice was real, and he was letting them know what he had heard. The next morning before school, Bunker reviewed gun safety with them in a manner that made MC1 very uncomfortable, which she described as follows:

> He did teach us how to load a shotgun, which is --I mean, I guess-- well, we've known how to use guns our whole entire life, but this time it was a little bit more aggressive, and he was, like, acting like somebody's, like, in the corner, and he did say, "You want to aim for the biggest part of their body," and he said, "Act like there's a person in the window." This was, like, in his room, kind of, and he said, "You want to blow their G.D. head off."

Bunker told MC1 and MC2 that there were bad people in the world, and "he's been hearing -- like, hearing, like -- he said 'they.' Like, 'They've been saying this.' I don't know who 'they' are, but it made me uncomfortable." Bunker told MC1 that the gun was unloaded and the shells were on the bed. MC1 recalled that she was not sure if her dad threatened her or not and that she was confused and uncomfortable. MC1 explained what she meant during cross-examination:

> A:     I think he threatened me because he said, "I will kill [MC1]." He was saying it with himself. There was no -- like, the recording did not saying anything, it was

4

him saying it. So I don't know if it was a threat from him or if he's actually hearing things.

Q:   Okay. But, again, that was him saying what he thought he heard on the recording?

A:   Yes, that's what he said to us.

Q:   Okay. Did you hear him make a threat toward any other person?

A:   To my sister.

Q:   Okay. What was the threat toward your sister?

A:   "I will kill you both," which is me and my sister.

Q:   And, again, but this is his recitation of what he thought he heard on the recording, correct?

A:   I don't know if he said--well, I know he said there was a recording, but I don't know if he was trying to make a--just put it on the recording or if he's actually saying it.

That day at school, MC1 spoke with her school counselor because she was "unsure about how it would be when [she] got back home" and concerned that her father would do or say something. During after-school basketball practice, police arrived and escorted her to the police station where she met her mother and her sister.

MC2 testified that her father had a stroke earlier that summer, and he was still recovering. She stated that on Sunday, her father was "really kind of off." She reiterated her sister's testimony that her father entered the bathroom when they were getting ready and said, "Y'all need to listen to this right now." MC2 testified that "he came in really fast, kind of aggressively." MC2 stated that he was "walking, like, really fast and he was, like, really

5

nodding his head and just really wanted our attention." She recalled the following conversation:

> "Do you not hear the voices that are going on?" He said, "You need to listen to this." And I was, like, "All I hear is static and cleaning." It was a black screen, and he said that the recording had whispers behind all the noise, saying, "I am going to kill [MC1]," which is my sister, and said it repetitively. And then it also eventually said, "I'm going to kill the both of you." He said this had been going on for a couple of days, if I remember correctly.

MC2 testified that this went on for about ten minutes, and she never heard anything on the recording. She stated that nothing like this had ever happened before, and it was "out of the blue." MC2 recalled that she had asked to be taken to the dollar store to get hygiene products, and her father told her that he would only take her "if you know how to properly operate this shotgun." MC2 explained that Bunker told them that the shotgun was not loaded and then showed them how to use it, "sort of flinging it around, and so I was kind of nervous, I was like, 'ok, careful.'" Bunker told her that she needed to know "how to kill someone with this. It could be later tonight, it could be tomorrow, could be any day[.]" MC2 stated that she did not hear her father specifically threaten her, her sister, or himself.

The next day, after receiving texts from her sister and her mother, MC2 went to the school counselor. After MC2 met with the counselor, her mother picked her up at school and took her to the police station.

The Harbor House evaluation concluded that Bunker did not meet criteria for residential substance-use treatment and recommended a psychiatric evaluation. Bunker's negative drug screening was admitted into evidence as was Bunker's discharge paperwork

from Baptist Health. Bunker moved for a directed verdict. First, he noted that the petition was based entirely on hearsay evidence, which was statutorily prohibited. Bunker also argued that on the basis of the evidence and testimony, there was no reasonable cause to believe that he was a danger to himself or anyone else. The court denied the motion.

Bunker testified that due to a heart condition he incurred while he was working, he had been medically retired from the military after a long and successful career as a nurse and combat medic. He testified that the events leading to his involuntary commitment began when he heard something on his Nest camera that recorded the front door. He played the recording for his daughters while they were getting ready in the bathroom and asked them what they heard, "and after about five times of asking, which is also normal, they said – [MC2] said, 'That's you.' I said, 'What's me?' And she said, 'Saying my name.' And I said, 'That is not me saying anything.'" He testified that he "couldn't tell if it was a joke or if one of them was pranking me, or what was going on." Bunker explained that the girls were laughing and joking. The next morning before school, Bunker realized that they had not gone over gun safety in a while, and it was time for a refresher. He recalled that the next day he was in the pickup line at MC2's school when he was detained and taken to Harbor House. There, he underwent a drug screen, which was negative for drugs. From there, he was sent to Baptist Health Medical Center-Little Rock and underwent a psychiatric evaluation and was discharged. Bunker testified that he was not suicidal, and he denied ever threatening the girls. He stated that this situation was a shock to him, and he had never had mental-health problems. Bunker explained that he had a stroke about three months earlier and had

received care at CHI St. Vincent North. Bunker accused Clark of lying in the petition, and regarding MC1's and MC2's testimony, he thought that it might have been a prank, or it was their perception of what happened.

From the bench, the court granted the petition on the basis of addiction and mental illness. The court found that Bunker presented a danger to himself and others in light of the testimony, exhibits, law, and other matters. Bunker's counsel asked for clarification, and the court additionally found that "there is concerns about this Court ~ about him being homicidal, suicidal, or gravely disabled, and that's pursuant to the statute 20-64-801." Counsel explained that pursuant to section 20-64-801, the court was required to find that "he has an addiction to drugs or alcohol, and he's been screened out for that, so how is the court making the finding?" The court agreed and clarified the finding, stating that "the Court's finding is that there's clear and convincing evidence for this Court, that the Respondent, Mr. Bunker, does have a mental illness and is need of an evaluation." Counsel asserted that "we did that already." The court found "that there is clear and convincing evidence that the Respondent is mentally ill and in need of an evaluation pursuant to Arkansas Code Annotated Section 20-47-201 et seq."

The circuit court denied Bunker's motion to dismiss. The court granted the State's petition for involuntary commitment and entered the order for his immediate detention. In the written order, the court found that it considered the pleadings, testimony, exhibits, law, arguments of counsel, and all other matters before the court, and there was clear and convincing evidence that Bunker is a clear and present danger to others, as defined by Ark.

Code Ann. § 20-47-207(c)(3). The court ordered that Bunker would be admitted to Baptist Health Medical Center-Little Rock for a mental-health treatment period of up to twenty-one days from October 30.

Bunker timely filed his notice of appeal, and this appeal followed.

## II. *Discussion*

### A. Standard of Review

This court reviews probate proceedings de novo and will not reverse the decision of the circuit court unless the decision is clearly erroneous. *Buchte v. State*, 337 Ark. 591, 990 S.W.2d 539 (1999). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Id.* The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. When a case becomes moot before litigation can run its course, appellate courts have regularly refused to permit mootness to determine the outcome, particularly in cases of involuntary commitments. *Black v. State*, 52 Ark. App. 140, 915 S.W.2d 300 (1996).

### 1. *Second Amendment rights*

For his first point on appeal, Bunker asserts that the circuit court erred in ordering the removal of his firearms. This issue was not raised below; thus, it is not preserved for

appeal. We will not address arguments, even constitutional ones, for the first time on appeal. *Jones v. State*, 2024 Ark. App. 283, at 5, 689 S.W.3d 98, 102.

2. *Involuntary commitment*

a. Petition based on hearsay

Bunker asserts that Clark's petition for involuntary commitment was impermissibly based on hearsay. He contends that both Ark. Code Ann. § 20-47-207(b)(2) and Ark. Code Ann. § 20-64-816(b)(1) require that a petition for involuntary admission or immediate detention be limited to facts within the petitioner's personal knowledge, and because Clark's petition was based on hearsay, the court erred by denying his motion to dismiss. We disagree.

A petition for immediate detention must be based on "facts personally known to the affiant." *See* Ark. Code Ann. § 20-64-816(b)(1). Similarly, Ark. Code Ann. § 20-47-207(b)(2) provides that the facts alleged in the petition "shall be limited to facts within the petitioner's personal knowledge." Additionally, a hearing must be held on a petition for involuntary confinement, and at that time, the court must determine whether clear and convincing evidence has been presented that the person sought to be involuntarily admitted is a danger to himself or to others. *Bates v. State*, 2016 Ark. App. 326, at 6, 495 S.W.3d 645, 649.

The State responds that the facts alleged in the petition were personally known to MC1 and MC2, who testified at his hearing that took place after the petition was filed, and their testimony cured any deficiency in the petition. The State contends that Ark. Code Ann. § 20-64-822 (Repl. 2018) provides that, in the case of a petition for involuntary commitment, the pleadings shall be deemed to conform to the proof; thus, after hearing MC1's and MC2's

10

testimony, the court was authorized to enter an order of involuntary commitment. We agree with Bunker that the initial petition was based on hearsay; however, we also agree with the State that, here, MC1 and MC2 testified about their direct knowledge of the events that led to Bunker's involuntary commitment, and the petition was deemed to have conformed to the proof offered at the hearing. Therefore, Bunker's argument lacks merit.

b. Hearsay testimony at the hearing

Bunker contends that the circuit court erred in overruling his objection to Clark's hearsay testimony because her testimony was not based on her personal knowledge or observations and did not fall under one of the Rule 803 or 804 exceptions. His argument is not well taken. First, the State is correct that Bunker did not contend below that Clark's testimony was not an exception to the hearsay rule. In that regard, his argument is not preserved. This court will not consider arguments raised for the first time on appeal; a party cannot change his or her grounds for an objection or motion on appeal but is bound by the scope of arguments made at trial. *Parret v. State*, 2022 Ark. App. 234, 644 S.W.3d 472.

To the extent Bunker argues that the court erroneously allowed hearsay testimony, we disagree. The court correctly overruled Bunker's hearsay objection, as is shown by the following colloquy:

| | |
|---|---|
| [STATE]: | Without telling me what anybody told you, your daughters or anyone else, why did you come and file an involuntary petition for commitment, a petition for involuntary commitment? |
| [CLARK]: | I was worried about the things I had heard, whenever we left on – |

11

| | |
|---|---|
| DEFENSE COUNSEL: | Judge, I will object on the basis of hearsay. |
| THE COURT: | I will overrule the objection. She stated she was worried about the things that she had heard. She didn't say what she had heard, but she stated -- her response was, she was worried, and the Court will allow that. |
| [STATE]: | And you were worried for what? |
| [CLARK]: | My daughters' safety. |

Hearsay is a statement, other than one made by the declarant while testifying, offered to prove the truth of the matter asserted. Ark. R. Evid. 801 (2018). Hearsay is generally inadmissible, but such testimony is not prohibited by the hearsay rule if it is not offered for the truth of the matter asserted. *Bragg v. State*, 328 Ark. 613, 623, 946 S.W.2d 654, 660 (1997). The Arkansas Supreme Court has held that a statement is not hearsay when it is offered to show the basis for a witness's actions. *Dednam v. State*, 360 Ark. 240, 246, 200 S.W.3d 875, 879 (2005). We affirm the circuit court's ruling that Clark's testimony was not offered to prove what MC1 and MC2 told her but to show that Clark was worried, and this caused her to file the petition.

c. Arkansas Code Annotated section 20-47-207(c)

Bunker contends that the circuit court's finding that there was clear and convincing evidence that he was a danger to himself or others was clearly erroneous because no physician or psychiatrist was called to testify regarding his mental health, and his quick discharge from Baptist Health indicated he was no danger to himself or others. He asserts that his daughters'

12

and ex-wife's testimony do not support his involuntary commitment. His argument is not well taken.

As stated above, a hearing must be held on a petition for involuntary confinement, and at that time, the court must determine whether clear and convincing evidence has been presented that the person sought to be involuntarily admitted is a danger to herself or to others. *Bates, supra.*

Arkansas Code Annotated section 20-47-207(c) provides,

(1) A person shall be eligible for involuntary admission if he or she is in such a mental condition as a result of mental illness, disease, or disorder that he or she poses a clear and present danger to himself or herself or others.

(2) As used in this subsection, "a clear and present danger to himself or herself" is established by demonstrating that:

(A) The person has inflicted serious bodily injury on himself or herself or has attempted suicide or serious self-injury, and there is a reasonable probability that the conduct will be repeated if admission is not ordered;

(B) The person has threatened to inflict serious bodily injury on himself or herself, and there is a reasonable probability that the conduct will occur if admission is not ordered; or

(C) The person's recent behavior or behavior history demonstrates that he or she so lacks the capacity to care for his or her own welfare that there is a reasonable probability of death, serious bodily injury, or serious physical or mental debilitation if admission is not ordered; or

(D)(i) The person's understanding of the need for treatment is impaired to the point that he or she is unlikely to participate in treatment voluntarily;

(ii) The person needs mental health treatment on a continuing basis to prevent a relapse or harmful deterioration of his or her condition; and

(iii) The person's noncompliance with treatment has been a factor in the individual's placement in a psychiatric hospital, prison, or jail at least two (2) times within the last forty-eight (48) months or has been a factor in the individual's committing one (1) or more acts, attempts, or threats of serious violent behavior within the last forty-eight (48) months.

(3) As used in this subsection, "a clear and present danger to others" is established by demonstrating that the person has inflicted, attempted to inflict, or threatened to inflict serious bodily harm on another, and there is a reasonable probability that the conduct will occur if admission is not ordered.

Bunker cites *Bates*, *supra*, to support his argument that there is no evidence that he is a clear and present danger to himself or others. In *Bates*, a teacher was attending an in-school training related to bullying when she became frustrated with the inadequacy of the training. Bates noted that others were not paying attention and asked the school principal and resource officer how many children had to be hurt or how many children had to die. Bates was visibly upset, asked the principal and resource officer to stop interrupting her and slammed the door when she left the meeting. Bates followed up on the meeting by sending texts to various individuals demanding that they do their jobs and reiterating her question: "How many children have to die?" The school reserve officer filed a petition for involuntary commitment and testified at the hearing that though Bates did not make specific threats, "her tone was very angry." He testified that he believed she was "under some influence," though he also testified that she passed a field-sobriety test. He did not feel like he was in danger during the incident. The State urged the court to involuntarily commit Bates "out of an abundance of caution" and asserted that "we have heard the testimony several times that children are going to die." The court agreed and granted the petition on the basis of mental

14

disease or defect and found that she was a danger to herself or others. We reversed, holding that there was no evidence that Bates was a danger to herself or others, and we specifically rejected the State's "abundance of caution" threshold for commitment.

The instant case is distinguishable from *Bates*. In *Bates*, a teacher angrily expressed her frustration with the training regarding school bullying. The key difference between *Bates* and the instant case is that in *Bates*, there was no dispute regarding the reality of the events leading up to the filing of the petition, and this distinction is key. No one alleged that Bates was hearing voices that were threatening the children, only that Bates was unimpressed with the measures taken to protect the children, and she was angry about the situation.

Contrastingly, here, at the hearing, MC1 and MC2 testified that Bunker told them that he heard "I will kill you, [MC1]. I will kill you, MC1, and I will kill you both" on the Nest camera recording, and this had been going on for two days. MC1 testified that her father was agitated, and he replayed the recording for around ten minutes while asking them if they heard it. MC1 testified that she was afraid: "I think he threatened me because he said, 'I will kill [MC1].' He was saying it with himself. There was no ~ like, the recording did not saying anything, it was him saying it. So I don't know if it was a threat from him or if he's actually hearing things." MC2 testified that their father was "really kind of off," and when he was showing them how to use a shotgun, he "was sort of flinging the gun around." He believed that there were bad people who wanted to kill them and instructed MC1 and MC2 to "blow their G.D. head off." MC1 recalled that her father denied being "crazy." Bunker testified that MC1 told him that she heard his voice saying the words; however, his testimony

15

conflicts with MC1's testimony that she did not hear any voices on the recording. Bunker's testimony was critically different than his daughters'. Bunker testified that MC1 told him it was his voice on the recording, and he disputed that he heard voices or might have a mental-health issue. The circuit court clearly found the girls' testimony credible and did not find persuasive Bunker's opinion that the girls were pranking him or misperceived the situation.

We acknowledge that there was no evidence that Bunker specifically threatened serious bodily harm to either himself or others; however, specific threats are not statutorily required in involuntary-commitment cases for mental illness. Instead, the evidence presented showed that Bunker was unable to perceive reality such that he was a danger to himself or others. Bunker denied having heard voices for several days threatening to kill his daughters, and he downplayed his agitation and resolve to kill anyone whom he perceived as a threat. There was ample evidence that Bunker's perception of reality was flawed in such a way that he was ready to cause serious bodily harm or death to others, and he refused to acknowledge he needed assistance with his mental health. We affirm the court's decision that Bunker was a clear and present danger to himself or others and hold that convincing evidence supports Bunker's involuntary commitment.

In *Lelieur v. State*, our court held that

clear and convincing evidence is evidence by a credible witness whose memory of the facts about which he or she testifies is distinct, whose narration of the details is exact and in due order, and whose testimony is so direct, weighty, and convincing as to enable the fact finder to come to a clear conviction, without hesitation, of the truth of the facts related.

16

2024 Ark. App. 225, at 6, 687 S.W.3d 378, 382 (quoting *Black v. State*, 52 Ark. App. 140, 142, 915 S.W.2d 300, 301, (1995)).

The crux of the court's decision lies in the credibility of the witnesses, and on appeal we defer to the court's superior position in weighing their testimony. *See Buchte, supra*. We are not left with a definite and firm conviction that a mistake has been made.

### d. Arkansas Code Annotated section 20-64-815

Bunker argues that there was no evidence that he was using or addicted to drugs; thus, the court's ruling that he should be committed under the addiction statute, Ark. Code Ann. § 20-64-815, was clear error. He is wrong.

Initially, at the conclusion of the hearing, the court found that Bunker should be committed under Ark. Code Ann. § 20-64-815; however, after counsel's objection to the court's finding that Bunker should be committed under the drug-use statute, the court changed its ruling to involuntary commitment on the basis of mental illness. In the written order, the circuit court cited the correct statute, Ark. Code Ann. § 20-47-207(c)(3), finding that Bunker was a clear and present danger to himself or others due to mental illness. Accordingly, Bunker's argument fails.

### 3. *Arkansas Rule of Civil Procedure 52—failure to find facts and conclusions of law*

Bunker argues that he asked for specific findings, and the court failed to do so as required by Arkansas Rule of Civil Procedure 52.

Arkansas Rule of Civil Procedure 52 provides in pertinent part that "if requested by a party at any time prior to entry of judgment, in all contested actions tried upon the facts

without a jury, the court shall find the facts specially and state separately its conclusions of law thereon[.]"

From the bench, the circuit court found that it had reviewed the evidence presented at the hearing, including the witnesses' testimony. When asked for more specific findings, the court stated that its decision was based on the clear and convincing evidence presented by the State. Counsel reiterated the request, asking, "Based on what?" Again, the court stated that it had considered all the evidence presented, and "the testimony, the exhibits, the Arkansas law, and all other matters and things before the Court." In the written order, the court found that Bunker was a clear and present danger to himself and others, and the involuntary commitment was based on the "petition, the pleadings, the testimony, the exhibits all the evidence, the Arkansas law, the arguments of counsel and all other matters and things before the Court."

Bunker cites for support, *McWhorter v. McWhorter*, 70 Ark. App. 41, 14 S.W.3d 528 (2000), in which this court reversed and remanded for the circuit court to make factual findings. *McWhorter* is inapplicable to the instant case. In *McWhorter*, the husband asked for factual findings regarding the method the court used to calculate his child-support obligation. The court entered the opinion without the requested findings. We held that

> [t]he letter opinion issued by the chancery court (and ultimately the final order) fails to set forth findings of fact upon which the chancery court relied in calculating Mr. McWhorter's income for child-support purposes. Among other things, the chancery court failed to indicate whether or not, in arriving at its conclusions, it considered depreciation or mileage expense with respect to Mr. McWhorter's work vehicle, and whether it took into account income derived from gambling. From the record, it is unclear as to how the chancery court arrived at its figures.

70 Ark. App. at 43, 14 S.W.3d at 529.

Contrastingly, here, the court's reasoning is not unclear. The court specifically stated that the decision was based on MC1's and MC2's testimony at the hearing, which it found credible and was given out of "love and concern for their father." The court also stated that it had considered the exhibits, pleadings, Arkansas law, and all other matters before the court.

The instant case is similar to *Weathersbee v. Wallace*, 14 Ark. App. 174, 686 S.W.2d 447 (1985), in which this court held that the findings of fact comported with the "thoroughness" requirements of Rule 52(a). In *Weathersbee*, the court found that "the issues before the court were decided based on all the evidence and particularly on the credibility of the witnesses." 14 Ark. App. at 179, 686 S.W.2d at 450. This court held that "the findings of the trial court must be sufficiently detailed to give us a clear understanding of the analytical process by which ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts," *id.* (quoting *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 433 (5th Cir. 1977)), and in that instance, the findings similar to the findings in the instant case were sufficient to understand the basis of the court's decision. Additionally, in *Weathersbee*, this court specifically held that Rule 52 "does not require specific findings on each and every factual question arising in a lawsuit." *Id.* at 179, 686 S.W.2d at 450. Accordingly, we affirm.

Affirmed.

GLADWIN and HARRISON, JJ., agree.

*Scholl Law Firm, P.L.L.C.*, by: *Scott A. Scholl*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.